Good morning. Lawrence Padway for the plaintiff and Dave Nagy. And before I commence my argument, I do owe an apology for missing the appearance on Monday with part of this panel. So I do want to extend my apologies for that. Well, can I make a couple of inquiries, Mr. Padway? I'm sorry? May I make a couple of inquiries regarding that case and your failure to appear? Sure. Okay. I'm just curious what happened because the clerk's office was desperately trying to reach you. I think Judge Gould had mentioned in his years he's never had a lawyer not appear or that we didn't hear from or we could not contact. Yes. And I'm just curious as to why we weren't able to reach you or your office. And I see you smiling, so maybe it was a humorous reason. I don't know. Can you tell me? Really? Yes. I was ready to appear and when I got up and checked my calendar, I misread it and I thought that the hearing was Tuesday instead of Monday. So I said, well, gosh, I thought it was Monday, but okay, if it's on Tuesday, then I'll take advantage of that and take the briefs and go hide somewhere for a couple hours and work on it without having interruption from staff and phone calls. And so by the time I discovered that I was on the wrong day, it was about 1030, so I was able to watch the argument live stream but not get to court on time. I guess what I don't understand, did it not occur to you to call? I did call. But you called after the argument. Well, I called as soon as I discovered the problem, but I think the clerk was... You called after the argument but were able to watch the argument live or you watched it... I called at about 1030 in the morning, which was just before the argument started, and I just got voicemail. I sent an email to Ms. White, but I assumed she was in court. Yeah, the review here, because I wanted to find out what happened from the clerk's office, and they have record of a voicemail that came in from what I was told after the oral argument had been presented. And then we could not reach you. Why could we not reach you? You couldn't reach me because in order to really focus on my preparation, I... Your preparation for what? For the argument, which I thought was on Tuesday. I turned off my phone and was hiding so that I could have a couple of hours without being interrupted by anybody. Forty years, that hasn't happened to me. So I really am very embarrassed about it, and I apologize. All right. I don't know if Judge Gould has any questions. No, I'll just comment briefly that whatever the reasons that caused this, it was the first time in more than 20 years of sitting that I've seen that occur. And also, I want to comment that for the other counsel who had other cases, it was sort of inconvenient for them because we had to shift the timing of our argument. I'm just very sorry about it, and... Thank you. Well, we'll take that into consideration and determine if anything else needs to happen. Thank you, though, for your explanation here today. So are you ready to proceed on this case, Mr. Nagy v. Hartford Life? Thank you, Your Honor. This has a fairly complex medical proof to it, and I'm not going to try to go through the details, but I think there are some very obvious errors in the trial court, the first of which is that it deals with the Work Well Report, which is an exercise test which is used to diagnose post-exertional malaise, which is a key factor in diagnosing chronic fatigue syndrome. And it's really the only thing that's of an objective nature for this disease, which is listed in the Institute of Medicine Report on Myalgic Encephalopathy and Chronic Fatigue Syndrome, which is in the record below. We had that work done by Dr. Snell, who wrote part of the Institute of Medicine Report, and the trial court found that one of the defense doctors, Dr. Dura, found Mr. Nagy was able to work. But that's not what Dr. Dura said. In fact, Dr. Dura, after looking at the Work Well Report, said the precise opposite. She said that that report was sufficient to show objectively that Mr. Nagy was not able to work at even a sedentary occupation. So that's a fairly significant error in the factual findings. And the other defense doctor who looked at that report was Dr. Ray. But Dr. Ray's report is problematic because he relies on an absence of significant and objective physical findings. And as this court has held in Saloma, there are no objective physical findings for chronic fatigue syndrome. So now Dr. Ray did indicate that the Work Well Report was sufficient to show a reduced, some impairment, some reduction in ability, but didn't go as far as Dr. Dura did. So these are problems. And the trial court said, well, that it didn't matter whether or not Mr. Nagy could work in 2016 because there's this gap in treatment between December of 2013 and September of 2014, and that Dr. Todd, who saw Mr. Nagy during that time period and over the next year, did not attest to any disability from chronic fatigue syndrome. But Mr. Nagy did not have funds. He was uninsured for a good period of this time, so he wasn't able to get a really good ongoing medical workup. And as Dr. Early said in 2013, there's nothing they could do anyway. So the lack of treatment, the trial court needs to consider the inability to pay for the treatment under the Regenitor case, which we cited, and that wasn't done. I'm sorry, when you say that, what wasn't done? The trial court did not take into consideration in evaluating the medical treatment which wasn't done the inability to pay for it. Are you talking about the 10-month gap? Yes. Okay. You're saying that the doctor shouldn't have considered that 10-month gap because Mr. Nagy could not pay for that treatment? Correct. But I thought there was evidence in the record that Mr. Nagy could possibly afford treatment since he was doing a variety of things like traveling with friends and other things. So why? He had, I mean, at different times he had some funds, but he did not have medical insurance. There wasn't a medical reason, at least according to Dr. Early, to do any kind of a workup because, I mean, there wasn't anything to do. Dr. Montoya, who has been following Mr. Nagy for this disease since 2008, had him on an annual return visit, you know, just come back once a year and see if there's anything that can be done. So there's not really anything to do. The lack of funds needs to be considered in that issue. And Dr. Todd misdiagnosed the condition and has it as autonomic dysreflexia, which is a complication of a spinal cord injury that happens either in the upper thoracic spine or the cervical spine. So her recommendation for stretching exercise in the records is always associated with this diagnosis that is just plainly wrong. I mean, it just is. So all of that needs to be considered and wasn't. And then we have Dr. Montoya's report. And in the first Nagy case, Dr. Montoya, his opinion was accepted. But on the second round, it was rejected because there was a typographical error in his report where he said, I instead of Mr. Nagy. And while the trial court says that that happened on more than one occasion in the report, it didn't. It's a one-time typographical error. And the sentence is, basically relates to that he had the WorkWell report done. So Dr. Montoya is an internationally known expert in this field. He has done research on how this is caused by a combination of viruses. He did the viral testing on Mr. Nagy. And his report was not commented upon by any of the defense physicians. So this needs to have a better review. It may be that when that's done, different conclusions can be made. But I think it's pretty hard to support a decision where Dr. Dura is directly the opposite of what she said. And Dr. Montoya, who is the specialist in this, is just rejected because of a typographical error in his report. This is a disease which has a viral origin and started in 2006. Mr. Nagy got to see Dr. Montoya in 2008. He was followed there. He was worked up at Stanford extensively. Certainly, the general practitioners in Georgia were not going to redo that workup. And I don't know for what reason they would have to redo it. So that's really the key work. And once you have this virus and the chronic fatigue that goes with it, as Dr. Montoya says in his report, you can go three or six months without having a flare-up or a lot of symptoms. But even then, if you're going to start adding in activity, you have to add it in very slowly. Because if you don't add it in very slowly, you'll crash. I mean, the primary treatment is don't do too much. And Mr. Nagy says, and his wife confirms, that he doesn't do very much. And to say that, well, okay, you're feeling better because you're not doing something, so go to work is just asking to make him sicker. I mean, there's nobody who says his condition improved. And the recovery rate on this disease is about 10 percent. So the fact that there's basically this gap in the medical records over a couple-year period is not very significant. And finally — Well, the gap isn't the only reason that the district court cited, too. No, it's not. But it's an important reason. It's the primary reason. And that's why I'm not saying that benefits have to be granted. I'm just saying that the analysis needs to be redone and redone properly. And I think also this is a good case to illustrate what I think is the biggest problem in these ERISA cases, which is that they're all tried on paper. And where it comes down to issues of credibility and de novo review, the rule needs to be changed. Did you ask the district judge to conduct an evidentiary hearing with live witnesses? The first case on the own occupation, I brought Mr. Nagy to court, and I said, you know, Your Honor, we should have some testimony, but, you know, the rule is in this circuit that we're not entitled to it. So we made the offer, but I couldn't really — Well, you won that one. How about on round two? Well, no, we did not raise it again in round two because the district court, I don't think, has the authority to do it. And I think that's a change that needs to be made here. Additionally, if you have these complex medical questions, there is authority for having live testimony, and I think that is something that should be considered by the district court as part of this. Counsel, may I interject a question, please? Are you saying that should have been considered sua sponte by the district court if it wasn't requested? No, it was not requested at the time. What I'm suggesting is that if the case is remanded, that that issue should be left to the district court, and it should be made clear that that's an option. Thank you. So that's really — And I think finally, when I say I'm out of time, is if the case is reversed, then I think the rule under the Pannebecker case applies, which we cited in our brief, so that the termination of the benefit should be overturned and it be left up to further proceedings to decide whether they should be terminated or not. Thank you. Thank you. Good morning, Your Honors. Michael Bernacchi for the Oracle Long-Term Disability Plan at Hartford Life and Accident Insurance Company. I'd like to start off by noting that the ERISA disability plan in question provides two years of own occupation disability benefits to the insured if they're disabled from their own occupation. Thereafter, they have to be disabled under the more rigorous any occupation standard. Now, as we all know, the district court awarded own occupation benefits to Mr. Nagy from 2011 through 2013. It was primarily based on a Social Security award that was produced 18 months after the decision was made and the administrative record was closed, and a Social Security award which found that Mr. Nagy could actually work in a sedentary occupation, but for some unknown reason it determined he could not do his specific job. As you know, we appealed that decision to this circuit. This is what this circuit upheld the district court under the clear error standard, and this is what they said. Although the facts here may be susceptible to more than one interpretation, we cannot say that the district court clearly erred in finding that Nagy's condition rendered him unable to perform work comparable to his prior job duties. It then cited the Ocean Garden Inc. case for the proposition that for a finding to be clearly erroneous, it must strike us with, quote, as wrong with the force of a five-week-old unrefrigerated dead fish, end quote. The reason I raise that now, it's the same standard that needs to be applied to Mr. Nagy's claim for any occupation benefits on appeal. And I think if you look at the record, there's literally no basis to overturn the district court's decision. During the any occupation period, not one of Mr. Nagy's treating physicians certified him as being disabled, neither Dr. Early nor Dr. Todd. That is extremely rare in these kind of cases. In fact, Dr. Todd suggested that if Mr. Nagy had simply complied with her treatment recommendations, he probably would be fine. For instance, he has sleep apnea. He doesn't wear a CPAP mask. He has thyroid problems. He doesn't take his thyroid medication. She suggested his energy would improve if he started a light exercise program. He blew her off. The second thing that's important that the district court noted is that Mr. Nagy's medical records were really pretty unremarkable during the any occupation period. As you noted, there was a 10-month gap where he didn't seek any treatment. Mr. Padaway, on appeal, claims it's because he didn't have the financial resources. But it seems to me he just didn't have any problems. Moreover, when he did seek treatment, his complaints were unremarkable. In fact, I think the visit to Dr. Todd in February of 2016, he specifically stated his CFS was inactive. The district court then awarded him benefits under the own occupation standard in April of 2016 and suggested he might be eligible for more disability benefits under the any occupation standard. And he goes back to Dr. Todd and starts complaining of chronic fatigue syndrome. The third thing that I think is important is we did have a comprehensive review during the claim. We had three separate physicians look at this claim. A neuropsychologist, an internist, and an infectious disease doctor. They all concluded that Mr. Nagy was able to work in a sedentary occupation. And it's important that their opinions concurred with the Social Security Administration doctors who also found that Mr. Nagy had the ability of sedentary work. Now, Mr. Padaway says that Dr. Dura found that Mr. Nagy was disabled. That's not what Dr. Dura said. Dr. Dura, in his original report, basically said, Mr. Nagy has full-time work capacity. I see no reason why he can't do a sedentary job. Mr. Nagy then belatedly submitted the work well report to us. Dr. Dura took a look at that and said, look, my opinion doesn't change. All this report does, it's a snapshot in time, and all it does is show he's deconditioned. I think actually going to work would improve his exercise capacity. Then the fourth thing that I think that I need to point out on this appeal that I think is extremely important is that the only evidence that Mr. Padaway offers that his client was disabled during any occupation period, and that would be between December of 2013 through roughly 2016 when the district court made his decision, is medical reports that he basically arranged for his client to undergo in the summer of 2016. He literally flew Mr. Nagy out from Georgia to San Francisco to undergo the work well testing, which is a two-day testing in which Mr. Nagy basically gets on an exercise bike, is hooked up to an oxygen mask, and has some blood monitors attached to his veins where he pedals a bike for about 20 minutes, and then he goes back the next day and does the same thing. Then the second thing he does is after that, Mr. Nagy flies back to Georgia, sees his treating physician, comes back again to California to see Dr. Montoya. Dr. Montoya is the infectious disease specialist that he originally saw in 2011. He had not seen Dr. Montoya since that time. Dr. Montoya, I know he went to Stanford, but he didn't talk with any of Mr. Nagy's treating physicians, didn't review any of Mr. Nagy's medical records, didn't understand that the Social Security doctors had found that Mr. Nagy was capable of sedentary work, didn't know such things as that Mr. Nagy wasn't wearing a CPAP mask or perhaps even had obstructive sleep apnea, wasn't taking his thyroid medication, was refusing to engage in regular exercise like his doctors recommended. Nevertheless, he wrote a report saying that, I believe my client has chronic fatigue and therefore he should be deemed disabled. Even if you accept those two reports, which we don't, all it shows you is that in July of 2016, Mr. Nagy finally had some doctors who were willing to certify him from being disabled. He needed to show a continuous disability from December of 2013 through July of 2016, and he fails to do this. And that was the bookend argument that Mr. Padaway was arguing about and that the district court rejected. You can't simply prove your disability claim, which requires an ongoing evidence of an ongoing disability, by simply having a doctor look at you at the start of the claim, then coming back three years later and having another doctor come back and say you're disabled at that point in time as well. So, you know, I'd be more than happy to answer any questions you have, but I don't even think we need to use the clear error standard in this case. The district court was obviously correct. And I would add that when the district court found that Mr. Nagy was disabled from his own occupation, again, it was primarily based on a Social Security award that concluded that, but also found that Mr. Nagy was able to perform sedentary work. I just have one question. Mr. Padaway mentioned in his oral argument that there's only a 10 percent recovery rate from the diagnosis that he has, that his client has. Did the court take that into account, or is that significant? I don't think it's necessarily significant. I mean, one thing that Mr. Padaway did, which was, you know, which is clever, but I think it misses the point, it's not a diagnosis policy. Plenty of people over 50 have chronic conditions, basically. They may ever flow. And just simply because somebody has chronic fatigue doesn't mean they necessarily can't work, basically. So I do think, I'm not for me, I don't know if that statistic is true, to be honest, because what we're looking at is functionality. And what we did indicate, you know, and let me point this out, Mr. Nagy claimed to have chronic fatigue since 2006, as Mr. Padaway indicated. He worked between 2006 and 2011. There's references in the doctor's notes that he was, like, with that diagnosis, either running, hiking, or walking, like, 11 miles on a given weekend or something like that. So simply because you have a diagnosis, it does not result in a disability. You have to meet the standard, which is unable to perform any occupation for which you're reasonably qualified. Appellant's counsel mentioned the matter of whether live witnesses are permitted in these kinds of cases in the Ninth Circuit. Would you like to comment on that? Yeah, I think it would destroy the premise behind ERISA, which is an efficient mechanism. So you agree with him that there are no witnesses allowed? You know, I've had cases years ago in unique circumstances, when you're talking about, like, credibility of documents, whether documents were forged or something like that. This isn't one of those circumstances. I mean, you know, the problem with allowing live witnesses is really, to keep them honest, you're going to allow us to subpoena records, and you're going to allow us maybe to interview other witnesses and call witnesses to contradict them, and then it becomes more like a bad faith case than it does an ERISA case. So I wouldn't say that witnesses should always be outlawed or should always be barred, but it's got to be a really unique circumstance, I think. Judge Gould, do you have any questions? I have no questions. I appreciated the argument of counsel. Thank you. You don't have any time, but I'll give you one minute. The treatment for this disease is to limit your activity to the point that you don't have the symptoms. So you don't expect findings in the medical records, and that's what this court held in Saloma. And I think the defense view is that the only way you can prove that you're continuously disabled is to go and do more activity, which is not recommended. It's against Dr. Montoya's recommendation. And when you get really sick from doing too much, then you prove you're disabled. And the problem with this disease is that you can keep your symptoms at bay by limiting your activity. And that's what you do. So if you don't want to need a doctor, you just limit yourself to an hour a day or whatever you can do. So how do you prove continuous disability? Thank you, Mr. Padway. Appreciate it. Thank you also, Mr. Bernanke. We appreciate the oral argument presentations. The case of Dave Nagy v. Hartford Life, an accident insurance company, is submitted. The last case on the docket is Sharemaster v. U.S. Securities and Exchange Commission. That also has been submitted on the briefs. So that concludes our docket for this morning, and we'll be in recess. Thank you very much.
judges: Gould, Murguia, Feinerman